Edward W. McBride, Jr. (8236)
Alyssa J. Wood (16613)
**VIAL FOTHERINGHAM LLP**
515 South 400 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801)355-9594
Facsimile:(801)359-1246
Ted.McBride@vf-law.com
Alyssa.Wood@vf-law.com
*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT MONTGOMERY, an individual; JD MONTGOMERY, an individual, and CHASE MONTGOMERY, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> AGENT SCOTT NESBITT, an individual; SPECIAL AGENT MICHELLE PICKENS, an individual; FBI SPECIAL AGENT JON ISAKSON, an individual; FEDERAL BUREAU OF INVESTIGATION; SALT LAKE PUBLIC CORRUPTION TASK FORCE; UTAH STATE BUREAU OF INVESTIGATION; UTAH DEPARTMENT OF PUBLIC SAFETY; STATE OF UTAH; UNITED STATES OF AMERICA; JOHN DOES 1 -5 <br><br> Defendants | **CIVIL RIGHTS COMPLAINT FOR DAMAGES** <br><br><br> Civil No.: <br><br> Judge: |

Plaintiffs Robert Montgomery, JD Montgomery and Chase Montgomery, by and through counsel, hereby complain against Defendants and each of them as follows:

## JURISDICTION AND VENUE

1.     This action is brought pursuant to 42 U.S.C. §§ 1983, and the Fourth, Fifth, Sixth,

Ninth and Fourteenth Amendments to the United State Constitution, and the case of *Bivens v. Six*

*Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

2.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously

mentioned statutory and constitutional provisions.

3.     Jurisdiction supporting Plaintiffs' claim for attorneys' fees is conferred by 42

U.S.C.§ 1988.

4.     This case is instituted in the United States Court for the District of Utah pursuant

to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

## PARTIES

5.     At all times relevant hereto, Plaintiffs Robert Montgomery and JD Montgomery

are residents of the State of Utah, and Chase Montgomery is a resident of the State of Arizona.

6.     Defendant Agent Scott Nesbitt is an individual who is employed by the State of

Utah, as an agent of the State Bureau of Investigation and at all times relevant to the Complaint

was acting under the State and Federal law as a sworn law enforcement officer in his official

capacity. During all times relevant hereto, this Defendant was appointed as a co-director of the

FBI Salt Lake City Public Corruption Task Force (SLCPCTF), formed on January 13, 2014, by a

Memorandum of Understanding between the FBI and SBI.

7.     Defendant Supervising Special Agent Michelle Pickens ("Pickens") at all times

relevant to the Complaint was acting under the color of federal law in her official capacity as

special agent, and in her individual capacity, operating under the employ of the FBI and was the

presumptive leader, along with Agent Scott Nesbitt, of the SLCPCTF. Pickens was directly involved in the unlawful arrest, seizure and prosecution of Plaintiffs.

8.      Special Agent Jon Isakson ("Isakson"), at all times relevant to the Complaint was acting under the color of federal law in his official capacity as a special agent, and in his individual capacity, operating under the employ of the FBI, and was assigned to the SLCPCTF. Isakson was directly involved in the issuance of fraudulent arrest warrant affidavits, and the unlawful arrest, seizure, and prosecution of Plaintiffs.

9.      Defendant Federal Bureau of Investigation ("FBI") is a federal agency of the United States with its headquarter office located in Washington D.C. with a branch office in Salt Lake County, Utah charged with the responsibility of working in accordance with constitutional rights to execute and enforce federal law within the State of Utah and employed Defendant Nesbitt.

10.     Defendant FBI Salt Lake City Public Corruption Task Force ("SLCPCTF) was a joint operation created by a Memorandum of Understanding between the FBI and the Utah Department of Public Safety specifically for the investigation of Mark Shurtleff and John Swallow, whose stated purpose was to "identify and target for prosecution for federal, state, county and local public officials or public entities; individuals associated with public officials or public entities, as well as individuals representing public officials or public entities; and individuals representing public officials or public entities who are committing or have committed violations of federal or state criminal statutes."

11.     Defendant Utah State Bureau of Investigations ("SBI") is a division of the Utah Department of Public Safety charged with investigating crime within the State of Utah.

12.     Defendant Utah Department of Public Safety ("DPS") is a department of the State of Utah charged with the responsibility of working in accordance with the constitutional rights to execute and enforce the law within the State of Utah.

13.     Defendant State of Utah is an appropriate defendant under 42 U.S.C. §1983, was at all times material to this Complaint the employer of Agent Scott Nesbitt.

14.     Defendant United States of America is the appropriate defendant pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971) and was at all times material to this Complaint the employer of FBI Supervisory Special Agent Nesbitt, Special Agent Michelle Pickens, Special Agent John Isakson and Special Agents John Does.

15.     John Does 1- 5 are unidentified law enforcement officers, and prosecutors employed by office of the FBI under color of state or federal law in their official capacity as officers, and in their individual capacity, and directly involved in the unlawful assault and seizure of Plaintiff's person, the unlawful arrest, seizure and prosecution of Plaintiffs.

## INTRODUCTION

16.     Throughout the years of 2012 through 2014, Defendants Scott Nesbitt, Michelle Pickens, and Jon Isakson were involved in the investigation of former Utah Attorney General, Mark Shurtleff and newly elected Utah Attorney General, John Swallow.

17.     In connection with that investigation, Defendants Scott Nesbitt, Michelle Pickens, and Jon Isakson suspected that John Swallow engaged in illegal fundraising in an alleged affiliation with Plaintiff Robert Montgomery.

18.     Upon information and belief, as part of that investigation, Defendants Scott Nesbitt, Michelle Pickens, and Jon Isakson visited Plaintiffs at their place of business several times to inquire about any information they had regarding John Swallow and Mark Shurtleff.

19.     Upon information and belief, as part of that investigation, Defendants Scott Nesbitt, Michelle Pickens, and Jon Isakson contacted an employee of Plaintiff Robert Montgomery, Adolf Travis Hards.

20.     Mr. Hards' lengthy criminal history includes weapon offense, possession of a firearm by a convicted felon, assault, burglary, assault on a prisoner, escape from official custody, jury tampering, possession of a narcotic, disorderly conduct, as well as other charges.

21.     Defendants Scott Nesbitt, Michelle Pickens, and Jon Isakson and the FBI equipped Mr. Hards with a wire recording device which Mr. Hards wore for four months, without the Plaintiffs' knowledge.

22.     The recordings did not reveal any illegal activities between Plaintiffs and Mark Shurtleff and John Swallow.

22.     On May 8, 2014, Mr. Hards instigated an altercation with the Plaintiffs at their place of business.

23.     Three months later, Plaintiffs were charged with Tampering with a Witness.

24.     According to the Information filed with the Court, the Plaintiffs were charged with One Criminal Count each:

Count 1.  TAMPERING WITH A WITNESS VICTIM OR INFORMANT, 18 U.S. Code 1512 (a)(2)(A) as follows: That on or about May 08, 2014, the defendant knowingly used and attempted to use, physical force and the threat of physical force against A.T. H., a person known to the grand jury, by hitting A.T.H. about the face and body, with the intent to influence, delay and prevent the testimony of A.T.H. in an official proceeding, in violation of U.S.C 1512(a)(2)(A) and 2.

25.    On August 8, 2014, without cause, under the direction of Defendants Pickens, Nesbitt, Isakson, members of the SLCPCTF and other law enforcement officers from the FBI, DPS, and SBI, including John Does, entered Plaintiffs' home with excessive force, including wielding deadly force, wearing body armor, and drawn firearms, including assault rifles and other automatic and semi-automatic weapons.

26.    The allegations against Plaintiffs were not violent in nature and did not require the use of force in the execution of the warrants.

27.    Without cause and with malice, these Defendants threatened, and physically, verbally and emotionally abused Plaintiffs.

28.    The actions of the Defendants in the execution of the arrest warrants were unlawful and malicious and in violation of the civil rights of the Plaintiffs.

29.    Plaintiffs were falsely arrested, detained and prosecuted.  Plaintiffs' were interrogated and were threatened with an exorbitant period of time in a federal prison.

30.    Plaintiffs were detained against their will despite not knowing why they were being detained until their first initial hearing, which took place August 12, 2014, at which time prosecutor William Kendall requested that all Plaintiffs be detained without release.

31.    Despite prosecutor William Kendall's previous request to keep Plaintiffs detained, on August 14, 2014, Mr. Kendall requested that Robert Montgomery, JD Montgomery and Chase Montgomery be released and that he was not seeking detention any longer.

32.    On September 25, 2014, a Notice of Filing Dismissal was filed by Colorado prosecutor Robert Troyer.

33.     On October 2, 2014, a Dismissal with Prejudice for Robert Montgomery, Chase Montgomery and JD Montgomery was signed by Judge Robert J. Shelby.

34.     Upon information and belief, Defendants submitted to the Grand Jury misleading and falsified information (Criminal Case No.: 2:14-cr-00418).

35.     Defendants' malicious and unlawful prosecution of Plaintiffs has caused Plaintiffs financial and emotional distress.

## GENERAL ALLEGATIONS

36.     Plaintiff Robert Montgomery was the sole owner of the business "Emmediate Credit Solutions, LLC" ("ECS") (which also encompassed www.mycreditcompany.com, and Emmediate Success, LLC) located at 575 East, 4500 South, SLC, UT  8410, Murray, Utah. Both JD Montgomery and Chase Montgomery were employed by Robert Montgomery at 575 East, 4500 South, SLC, UT  8410, Murray, Utah. Plaintiff Robert Montgomery also employed Plaintiffs JD Montgomery and Chase Montgomery.

37.     ECS was incorporated in 2011 under the laws of the State of Utah.

38.     ECS's primary purpose was assisting clients with credit repair.

39.     ECS, along with www.mycreditcompany.com, and Emmediate Success, LLC employed approximately 60 – 100 employees in their Murray, Utah headquarters office, as well as approximately 40 employees nationwide.

40.     From October 2011 to August 2015, ECS, along with www.mycreditcompany.com, and Emmediate Success, LLC, ECS generated a revenue in the

amount of approximately $6,000,000.000 to $9,000,000.00 and was on track to generate a revenue of $100,000,000.00.

41.     In February of 2012, Plaintiff Robert Montgomery attended a fund raiser for John Swallow. He was approached and asked to organize a future fundraiser for the campaign of John Swallow for Attorney General of Utah.

42.     Plaintiff Robert Montgomery organized two fundraisers for the campaign of John Swallow. The first fundraiser took place April 6, 2012 at Mimi's Café, 5223 S. State Street, Murray, Utah. Robert Montgomery extended an invitation to attendees and provided raffle prizes for contributors to the campaign, which included an I-Pad, and other prizes not exceeding $2,000.00.

43.     The second fundraiser took place April 11, 2012 at Riverwalk Grill and Steakhouse. Robert Montgomery extended an invitation to attendees and provided raffle prizes for contributors to the campaign, not exceeding $2,000.00 in total.

44.     Robert Montgomery did not make a monetary contribution to John Swallow's campaign at any point; during either fundraiser, nor at any point before or after.

45.     Sometime before May 8, 2014, Adolf Travis Hards was hired as a Sales Representative at Plaintiff's place of business, ECS.

46.     Mr. Hards was employed for the Plaintiff at ECS and was terminated.

47.     Prior to Mr. Hards' termination from ECS, he was approached by the FBI and its agents for the sole purpose of recording the Plaintiffs at ECS without their knowledge.

48.     The FBI and its agents provided Mr. Hards with a wire recording device to wear while he was employed with ECS.

49.    Mr. Hards wore this wire recording device for approximately 4 months without any of Plaintiffs' knowledge.

50.     No information was obtained from Mr. Hards' secret surveillance.

51.    On May 8, 2014, at approximately 12:00 pm, Mr. Hards arrived at ECS in Murray, Utah.

52.    Mr. Hards entered the lobby, then entered an office where Jeremy Ertmann was conducting an interview. Mr. Hards was screaming obscenities; disrupting the business, and the other employees.

53.    Mr. Hards told Mr. Ertmann he wanted to receive his last payroll check from ECS; stating that the previously received payroll check could not be cashed due to insufficient funds.

54.     Mr. Ertmann instructed the accountant of ECS to issue Mr. Hards a new check, and Mr. Hards was given the new check, after which he left the premises.

55.    Approximately 2:00 pm, Mr. Hards returns to ECS with John Pickett (Mr. Hards' brother-in-law) and Mr. Hards again enters the lobby, with John Pickett staying inside of the vehicle.

56.    On information and belief, John Pickett was in possession of a firearm.

57.    Mr. Hards screamed and threatened Plaintiff Robert Montgomery, as well as other employees, with violence.

58.    Mr. Hards became physical and assaulted Plaintiff Robert Montgomery.

59.    Jeremy Ertmann physically defended Plaintiff Robert Montgomery, hitting Mr. Hards in the face once, and then again to subdue Mr. Hards.

60.     Mr. Hards was then removed from the facility by the Plaintiffs and other employees of ECS.

61.     While Plaintiff Robert Montgomery and Jeremy Ertmann were removing Mr. Hards, he made threats to Plaintiff Robert Montgomery, taunting him to hit him, so that he can "take all of his money" and screamed insults and obscenities, urging him to retaliate in violence.

62.     Plaintiffs never hit, pushed, or acted physically violent towards Mr. Hards.

63.     Plaintiff Robert Montgomery stated that during the chaos of the incident that took place with Travis Hards on May 8th, 2014, Mr. Hards said something about "a check" and that supposedly he had "called the FBI" on Plaintiff Robert Montgomery, not stating specifically why or the context of any conversation with FBI.

64.     During his interrogation, Plaintiff Robert Montgomery then stated that he wasn't sure if Mr. Hards really spoke to the FBI or not:

| | |
|---|---|
| Agent Nesbitt: | "Was that the first you'd heard of that? Or did you know that before this?" |
| Robert Montgomery: | "No. That's the first I'd heard of that ever heard of it ever…" |

65.     Plaintiffs never hit Mr. Hards, never choked him, or assaulted him in any way, despite Mr. Hard's continually taunting him, saying "Come on, come on to the schoolyard, I take you on. I'll kill you, I'll kill you. I'll show you who's a real man…"

66.     The ECS receptionist called the police, and they arrived at ECS after which Mr. Hards and John Pickett were escorted into a police vehicle and left ECS.

67.     Plaintiffs were not charged with any crime nor arrested on the day of this altercation.

68.     Upon information and belief, on August 6, 2014 the FBI and agent Nesbitt presented to the Grand Jury false evidence in connection with one count of 18:1512(a)(2)(A) for each of the Plaintiffs – Tampering with a witness, victim, or informant, which states that punishment for this offense in the case of "***whoever uses physical force or threat of physical force against any person, or attempts to do so, with intent to – influence, delay, or prevent the testimony of any person in an official proceeding; imprisonment for not more than 30 years; and in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years"***.

69.     Plaintiffs could not have intended to influence Mr. Hards because Plaintiffs did not know Mr. Hards was an informant.

70.     Plaintiffs could not have intended to influence Mr. Hards because Mr. Hards had no knowledge.

71.     Plaintiffs could not have influenced someone who has no material information.

72.     Upon information and belief, Mr. Hards was not called as a witness at any proceeding, including the Grand Jury proceeding.

73      Somehow, despite the obvious and blatant lack of evidence on August 6, 2014, the Plaintiffs were indicted by a Grand Jury.

74.     On August 7, 2014, Arrest Warrants were issued.

75.     Defendants Scott Nesbitt, Michelle Pickens, and Jon Isakson organized, briefed, and led the execution of the arrest warrant and search teams made up of other members of the SLCPCTF and other law enforcement officers from the FBI, DPS, and SBI, including John Does, who entered the Plaintiffs' homes with excessive force, including wielding deadly force, wearing

body armor, and with-drawn firearms including assault rifles and other automatic and semi-automatic weapons, threatened,  and physically, verbally and emotionally abused Plaintiffs and their wives and children, including an infant child, while all Plaintiffs were in the security of their home.

76.     The August 8, 2014, execution of these warrants was unlawful and the actions of the agencies and officers involved violated the Plaintiffs' civil rights.

77.     On information and belief, the individual Defendants acted with intent and malice.

78.     Plaintiffs were arrested, transported to jail, booked and processed, and maliciously prosecuted.

79.     Plaintiffs were all interrogated by agents of the FBI, including Agent Nesbitt.

80.     Plaintiffs' interrogation interviews involved questions regarding unrelated events, regarding Mark Shurtleff and John Swallow. Plaintiff Robert Montgomery was asked about the details regarding the fundraisers he agreed to host for the campaign of John Swallow that took place August 6 and 11, 2012.

81.     Plaintiff Robert Montgomery was also asked regarding his interaction with Mark Shurtleff, and how many times he met with John Swallow and/or Mark Shurtleff, how many financial contributions he made to John Swallow's campaign and multiple other interrogation questions regarding John Swallow and Mark Shurtleff.

82.     Defendant Nesbitt explains that he has been assigned to an FBI Task Force.

83.     Defendant Nesbitt represented to the Plaintiff that he was arrested for tampering with a witness, Mr. Hards.

84.    Defendant Nesbitt explained to Plaintiff Robert Montgomery that Mr. Hards was an FBI witness. Plaintiffs were not aware of the fact that they were being surveilled.

85.    Plaintiffs cooperated and complied with all of Defendant Nesbitt's requests regarding the incident that took place May 8th, 2014 involving Mr. Hards.

86.    Defendant Nesbitt told Plaintiff Robert Montgomery according to some accounts, Plaintiff Robert Montgomery choked Mr. Hards. But then later said, "We are not alleging that you hit him, punched him or anything…"

87.    On interrogation video number two, at minute 13, Defendant Nesbitt asks Plaintiff Robert Montgomery if he ever contacted the Attorney General's office, John Swallow or Mark Shurtleff in regards to his businesses. Mr. Montgomery states that he never contacted either the Attorney General's office, nor John Swallow or Mark Shurtleff at any time in regards to business, and he "never knew Mark Shurtleff and never really has".

88.    Defendant Nesbitt then asked:

Agent Nesbitt:              "How do you know John Swallow?"

Robert Montgomery:      "I did some fundraising for him"

89.    Defendant Nesbitt then asked the Plaintiff Robert Montgomery to explain, and he explains that he met John Swallow at a fundraiser, at which time Mr. Swallow asked him to host a fundraiser for his campaign.

90.    Plaintiff Robert Montgomery explained that he agreed to host a fundraiser because he believed in John Swallow and what he professed to believe in and his campaign.

91.    Defendant Nesbitt then **asked if Plaintiff Robert Montgomery agreed with John Swallow's political beliefs:**

**Agent Nesbitt:**                    **"Why would you support John Swallow?"**

92.     Defendant Nesbitt asked specifically about the fundraisers that took place for John Swallow and the details of what happened during the fundraisers.

93.     Defendant Nesbitt asked if any money was collected at these fundraisers.

94.     Defendant Nesbitt asked who made donations, how many people attended each fundraiser, and exactly who they were.

95.     When told about some raffle prizes that Plaintiff Robert Montgomery purchased for the fundraisers, Defendant Nesbitt asked if John Swallow knew about these prizes, asked if he still had the receipts for these items, and what bank accounts the money for these fundraisers were taken out of, if it was from a personal or business account, and where the account was located.

96.     Defendant Nesbitt asked the Plaintiff about Renae Cowley. Plaintiff Robert Montgomery then explains that he knows she was a lobbyist.

97.     Defendant Nesbitt asked if Plaintiff Robert Montgomery ever did anything with her social.

98.      Defendant Nesbitt asked if Plaintiff Robert Montgomery ever took her to dinner.

99.     Defendant Nesbitt asked if Plaintiff Robert Montgomery ever gave her any money personally.

100.    Defendant Nesbitt asked about Plaintiff Robert Montgomery's interaction with John Swallow after the fundraisers.

101.    Defendant Nesbitt explained that Plaintiff Robert Montgomery has been federally indicted and they will contact the United States Attorney's office and the prosecutor and he is not

sure if Mr. Montgomery will go straight to the courthouse for his initial appearance or go straight to jail.

102.    Plaintiff Robert Montgomery pleaded with Agent Nesbitt to be released due to his family.

| | |
|---|---|
| Robert Montgomery: | "What will it take for you guys to ask not to be (retained)? Because I have a family, and…" |
| Agent Nesbitt: | "Yeah, there are certain factors…" |
| Robert Montgomery: | "Are you guys shutting down my business?" |
| Agent Nesbitt: | "Our case, although I have asked you a lot about it, what you are charged with has nothing to do with your business, other than the incident that occurred there…" |
| Robert Montgomery | "What does it have to do with?" |
| Agent Nesbitt: | "Well, it's the witness tampering issue…. what I'm saying is…there likely will be an investigation into the activities of your business. I mean, there's already one beginning.  I've asked you some stuff about it.  Travis did contact the FBI, and there's that. But as far as today and what you've been charged with today has nothing to do with your business.  We are not shutting down your business. It is intertwined, but yeah….the witness tampering is not for the practices of your business. It's more what happened to a person that reported stuff to the FBI" |
| Robert Montgomery: | "Even if I didn't know he was a witness?....I didn't know that he was serious. He was a drug user….we fired him so many times…." |
| Agent Nesbitt: | "But that is what it is related to…" |
| Robert Montgomery: | "Does it have to do with John Swallow?" |
| Agent Nesbitt: | "Yeah...I'm the case agent for that John Swallow |

case. So that's why we have an interest in that as well. Being on that task force I have an interest in many things but that is one of my main cases. The John Swallow and Mark Shurtleff case. And there's an FBI agent around here somewhere that is my partner in that case. So, that's why I asked you about John Swallow. So, yeah. There's several things going on here."

103.    Plaintiffs were unlawfully arrested, booked, and detained.

104.    Defendants used the altercation as a pretext in an attempt to obtain information regarding the politically motivated investigation related to the alleged improper conduct of Mark Shurtleff and John Swallow.

105.    Plaintiffs were kept in jail for seven days unlawfully, beginning May 8, 2014, despite not knowing why there were being detained.

106.    On August 12, 2014, Plaintiffs appeared before Judge Brooke C. Wells and Plaintiffs entered pleas of not guilty. Defendants sought detention for Plaintiffs, stating that they were "violent criminals" and a detention hearing date was set for August 14, 2014.

107.    On August 14, 2014, Plaintiff Robert Montgomery was preparing to attend the detention hearing and passed Defendant Nesbitt in the hallway. Defendant Nesbitt gave Plaintiff Robert Montgomery his business card, after which Plaintiff Robert Montgomery handed it to his attorney, Cara Tangaro, for her information regarding who conducted his interrogation interview.

108.    Upon entering the courtroom, Ms. Tangaro handed the card to attorney William Kendall and explains that Defendant Nesbitt conducted the interrogation interview of Plaintiff Robert Montgomery.

109.    Mr. Kendall then requests that all Plaintiffs not be retained and requests they be released under "special circumstances".

110.    On September 17, 2014, Notice of Attorney Appearance was filed by Colorado attorney Robert C. Troyer on behalf of the U.S.

111.    On September 25, 2014, attorney William Kendall withdrew as counsel for Plaintiffs in the case.

112.    October 2, 2014, the case was dismissed with prejudice regarding Robert Montgomery, JD Montgomery and Chase Montgomery.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**On Behalf of Plaintiff Pursuant to the Supreme Court Ruling
in *Bivens v. Six Unknown Agents***

113.    As a direct and proximate result of the said Defendants' actions and conduct, Plaintiffs were deprived of their rights, privileges and immunities under the Fourth Amendment of the United States Constitution, specifically the rights to be secure in their persons, papers and effects against unreasonable search and seizure; not to be deprived of life, liberty, and property without due process of law; the right to not have excessive, wanton, or gratuitous force used without provocation in executing a search warrant and in effectuating an arrest.

114.    The United States Supreme Court in *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971), ruled that an implied cause of action existed for a Plaintiff, like Plaintiffs herein.

## SECOND CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth
Amendments to the Constitution of the United States**

115.   42 U.S.C. §1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom
> or usage of any state or territory or the District of Columbia subjects or
> causes to be subjected any citizen of the United States or other person
> within the jurisdiction thereof to the deprivations of any rights, privileges,
> or immunities secured by the constitution shall be liable to the party injured
> in an action at law, suit in equity, or other appropriate proceeding for
> redress…

116.   Defendants, under color of state law, subjected Plaintiffs to the

foregoing conspiracies, unlawful acts and omissions without due process of the law

and violation of 42 U.S.C §1983, thereby depriving Plaintiffs to rights, privileges and

immunities secured by the Constitution and laws, including, but not limited to, those

rights, privileges and immunities secured by the Fourth and Fourteenth Amendments

to the United States Constitution, including, without limitation, deprivation of the

following constitutional rights, privileges, and immunities:

a. Plaintiffs were denied their constitutional rights not to be deprived of their

liberty without due process of the law;

b. Plaintiffs were denied their constitutional right to be free from the

unlawful search and seizure of their persons and their real and personal

property under the Fourth Amendment and in violation of their right to due

process under the Fourteenth Amendment;

c. Plaintiffs were denied their constitutional right to be free from unlawful arrest

without probable cause protected under the Fourth Amendment and in violation

of their right to due process under the Fourteenth Amendment;

d. Plaintiffs were denied their constitutional right to be free from malicious

prosecution protected under the Fourth Amendment and in violation of their

right to due process under the Fourteenth Amendment; and

e. Plaintiffs were denied their constitutional right to be free from

unprovoked excessive and unlawful use of force by law enforcement.

117.    To the extent any of these constitutional deprivations require a showing of specific

intent and/or motive, the individual state and local law enforcement and prosecutorial Defendants

acted intentionally, maliciously, and/or with reckless disregard for the natural and probable

consequences of their actions.

118.    As a result of this violation, Plaintiffs suffered physical and emotional injuries,

including but not limited to those associated with deprivation of liberty, severe emotional distress

and suffering, severe and permanent mental distress and turmoil, anxiety, depression, insomnia,

embarrassment, and humiliation, and loss of income as is more fully detailed above.

119.    The state and local law enforcement Defendants' unlawful misconduct was

objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs'

constitutional rights.

120. As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling them to compensatory and special damages. Plaintiff is further entitled to attorney fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

121. The Defendants, conspired and/or acted in concert to institute, prosecute and continue criminal proceedings against Plaintiff without probable cause.

122. At the time of the complained of events, Plaintiffs had the clearly established constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment and in violation of due process under the Fourteenth Amendment.

123. Any reasonable police officer or prosecutor knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

124. Individual federal, state and local law enforcement Defendants violated Plaintiffs' Fourteenth and Fourth Amendment rights to be free from malicious prosecution without probable cause and without due process when they worked in concert to secure false charges against him, resulting in his unlawful confinement and prosecution.

125. By the almost immediate dismissal of all criminal charges for all Plaintiffs, it is clear that there was malicious prosecution without cause, with no evidence.

### THIRD CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1983-Excessive Force in violation of the Fourth and Fourteenth Amendments

126. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

127.    At the time of the complained of events, Plaintiffs had a clearly established constitutional rights under the Fourth Amendment to be secure in their person from unreasonable seizure through excessive force.

128.    Plaintiffs also had the clearly established Constitutional right under the Fourteenth Amendment to bodily integrity and to be free from excessive force by law enforcement.

129.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

130.    The federal, state and local law enforcement Defendants' actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them and violated these Fourth Amendment rights of Plaintiffs.

131.    The federal, state and local law enforcement Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiffs' protected rights. The force used by these state and local law enforcement Defendants shocks the conscience and violated their Fourteenth Amendment rights.

132.    The federal, state, and local law enforcement Defendants unlawfully seized the persons of Plaintiffs by means of objectively unreasonable, excessive, and conscious shocking physical, verbal and emotional force, thereby unreasonably restraining Plaintiffs of their freedom.

133.    The force used constituted deadly force in that it could have caused death and did cause serious mental and emotional injury.

134.    None of the federal, state and local law enforcement Defendants took reasonable steps to protect Plaintiffs from the objectively unreasonable and conscience shocking excessive force of other Defendant officers or from the excessive force of later responding officer's despite

being in a position to do so. They are each therefore liable for the injuries and damages resulting from the objectively unreasonable and conscience shocking force of each other officer.

135.    The federal, state and local law enforcement Defendants engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiffs' federally protected constitutional rights.

136.    The federal, state and local law enforcement Defendants did so with shocking and willful indifference to Plaintiffs' rights and their conscious awareness that they would cause Plaintiffs severe mental and emotional injuries and potentially could have caused grave physical injury including death.

137.    These individual federal, state and local law enforcement Defendants acted in concert and joint action with each other.

138.    The acts or omissions of the federal, state and local law enforcement Defendants as described herein intentionally deprived Plaintiffs of their constitutional rights and caused them other damages.

139.    These individual federal, state and local law enforcement Defendants are not entitled to qualified immunity for the complained of conduct.

140.    The individual federal, state and local law enforcement Defendants to this claim, at all times relevant hereto, were acting pursuant to state and municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiffs.

141.    As a direct and proximate result of individual federal, state, and local law enforcement, Plaintiffs have suffered actual physical and emotional injuries, and other damages

and losses as described herein entitling them to compensatory and special damages, in amounts to be determined at trial. As a further result of the individual federal, state and local law enforcement Defendants' unlawful conduct, Plaintiffs have incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses and may continue to incur further medical and other special damages related expenses, in amounts to be established at trial.

142.    On information and belief, Plaintiffs will continue to suffer lost future earnings and impaired earnings capacities in amounts to be ascertained in trial.

143.    Plaintiffs are further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1983, prejudgment interest and costs as allowed by federal law. There may also be special damages for lien interests.

144.    In addition to compensatory, economic, consequential and special damage, Plaintiffs are entitled to punitive damages against each of the individually named individually federal, state and local law enforcement Defendants under 4 U.S.C. § 1983, in that the actions of each of these individual federal, state and local law enforcement Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

145.    The acts and omissions of all individual Defendants were moving forces behind Plaintiff's damages.

146.    These individual federal, state and local law enforcement and criminal justice and prosecutorial Defendants acted in concert and joint action with each other.

147.     The acts or omissions of the federal, state and local law enforcement and criminal justice and prosecutorial Defendants as described herein intentionally deprived Plaintiffs of their constitutional and statutory rights and caused him other damages.

148.     For the reasons articulated above, the federal, state and local law enforcement and criminal justice and prosecutorial Defendants are not entitled to absolute or qualified immunity for the complained of conduct.

149.     The Defendants at all times relevant hereto were acting pursuant to state/municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in its actions pertaining to Plaintiffs.

150.     As a proximate result of the federal, state and local law enforcement, criminal justice and prosecutorial Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. Plaintiffs are further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

**FOURTH CLAIM FOR RELIEF**

**Violation of 42 U.S.C. §1983 - Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth and Fourteenth Amendments and in violation of 42 U.S.C.§1981 *Monell* Claim Against the Utah State Defendants**

151.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

152.    Plaintiffs had the following clearly established rights at the time of the complained conduct:

a.  the right to be secure in their person from excessive force, under the Fourth Amendment;

b.  the right to bodily integrity and to be free from excessive force by law enforcement under the Fourteenth Amendment; and

c.  the right to be free from malicious prosecution under the Fourth and Fourteenth Amendments

153.    Federal, State, and Salt Lake County Defendants had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia*:

a.  a policy, practice, and custom of use of excessive force against suspects;

b.  a policy, practice, and custom of failing to properly train or supervise officers in the proper techniques of apprehending and arresting suspects;

c.  a policy, practice, and custom of using false or fabricated evidence in arrest and search warrant affidavits;

d.  a policy, practice, and custom of not following proper identification proceedings and using tainted identifications in effectuating the arrest and prosecution of innocent suspects;

e. a policy, practice, and custom of failing to properly discipline officers who violate the United States Constitution or law, or otherwise transgress the rights of criminal suspects during their investigation; and

f. a policy, practice, and custom of immediate public vilification of persons accused of "high-profile" crimes with concomitant refusal to consider evidence inconsistent with that portrayal.

154. These interrelated policies, practices, and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of Plaintiffs' Constitutional violations and injuries, as set forth above.

155. These interrelated policies, practices, and customs, separately and/or together, were the direct and proximate cause of the injury and damage to Plaintiffs and violated their rights guaranteed by the United States Constitution.

156. The existence of these interrelated policies, practices, and customs can be inferred from numerous incidents reflecting a pattern of police and prosecutorial misconduct like that alleged herein.

157. The existence of these interrelated policies, practices, and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized by individuals with policymaking authority in the Federal, State and Salt Lake County law enforcement and criminal justice agencies.

158. Defendants are not entitled to absolute or qualified immunity for the complained of conduct.

159. Federal, State, and Salt Lake County Defendants were, at all times relevant, policymakers and in that capacity established policies, procedures, customs, and/or practices for these law enforcement and criminal justice agencies.

160. Federal, State, and Salt Lake County Defendants have created and tolerated an atmosphere of lawlessness, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiffs and of the public.

161. In light of the duties and responsibilities of law enforcement officers and prosecutors that participate in preparation and approval of search warrants, arrests and preparation of police reports and criminal information on alleged crimes, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

162. The deliberate indifference to training and supervision by Federal, State and Salt Lake County Defendants resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to said Defendants and was the moving forces in the constitutional and federal violations complained of by Plaintiffs.

163. As a direct result of Defendants' unlawful conduct, Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses as described herein

entitling him to compensatory and special damages. Plaintiffs are further entitled to attorney's fees and costs.

164.   Pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## **PRAYER FOR RELIEF**

Plaintiffs pray that this Court enter judgment for the Plaintiffs and against each of the Defendants and grants:

A.   Compensatory and punitive damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be set by a jury;

B.   Economic losses on all claims allowed by law;

C.   Special damages; Loss of wages and loss of future earnings.

D.   Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, including expert witness fees, on all claims allowed by law;

E.   Pre and post-judgment interest at the lawful rate; and

F.   Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Dated this 1st day of August 2018.

**VIAL FOTHERINGHAM LLP**

/s/ Edward W. McBride, Jr.
Edward W. McBride, Jr.